## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 13-60579-CIV-ROSENBAUM/HUNT

SPARTA INSURANCE COMPANY,

      Plaintiff,

v.

MIGUEL COLARETA, AIDA COLARETA,
PAMELA COLARETA, and
ALLIED MEDICAL TRANSPORT, INC.,

      Defendants.

_____/

### <u>ORDER</u>

This matter is before the Court upon Defendants' Motion for Summary Judgment [ECF No. 36] and Plaintiff's Cross-Motion for Summary Judgment [ECF No. 41]. The Court has reviewed the Motions, all supporting and opposing filings, and the record in the case. For the reasons set forth below, Defendants' Motion for Summary Judgment is denied, and Plaintiff's Cross-Motion for Summary Judgment is granted.

### *I.  Introduction*

Plaintiff Sparta Insurance Company filed this action against Defendants Allied Medical Transport, Inc., and Miguel Colareta, Aida Colareta, and Pamela Colareta ("the Colareta Defendants") seeking declaratory relief with respect to its rights and obligations under an insurance policy in connection with an underlying lawsuit between Allied and the Colareta Defendants pending in the 17th Judicial Circuit in and for Broward County, Florida. The underlying action stems from Miguel Colareta's fall from an Allied transport van and the damages that allegedly arose out of that incident. Allied holds an insurance policy with Sparta, and Sparta seeks a declaration from this

Court that coverage under that policy is available only under the Business Auto coverage portion. Both parties have moved for summary judgment.  ECF No. 36; ECF No. 41.

## II.  Material Facts

### A.  The Underlying Accident

The underlying dispute arises from an accident that occurred on April 16, 2012.  ECF No. 37-1 at ¶¶ 15-21.  Miguel Colareta is an individual suffering from Arnold Chiari malformation, which renders him dependent on a wheelchair.  *Id.* at ¶ 7.  As a result of this physical disability, Colareta requires transportation assistance. *Id.* at ¶ 9.  Allied is a non-emergency transport company that provides transportation services to individuals with disabilities.  ECF No. 37 at ¶ 1; ECF No. 1 at ¶ 10.

On the date in question, Allied transported Colareta to his place of employment through the use of an accessible van owned, leased, or operated by Allied.  ECF No. 37 at ¶ 12.  Allied's accessible van was equipped with a wheelchair platform at the rear of the vehicle, which allowed wheelchair-bound passengers to disembark.  ECF No. 37-1 at ¶ 11.  Upon arrival at Colareta's place of employment, the driver exited the transport van and walked to the rear of the vehicle to begin operating the wheelchair lift.  ECF No. 37 at ¶ 13.  While Colareta was attempting to disembark from the vehicle, he fell from the handicap platform onto the concrete below and suffered serious injury. *Id.* at ¶ 14.

The Colareta Defendants subsequently sued Allied, alleging various theories of negligence, including, among others, negligent failure to monitor and properly instruct Colareta while he was exiting from the vehicle, negligent failure to properly and adequately maintain the vehicle and

wheelchair lift, and negligent failure to provide proper training to employees.  ECF No. 37-8 at ¶ 23.
In brief, the Colareta Defendants allege that the driver of the van failed to warn Miguel Colareta
when he was safely on the platform and that the latch on the outer barrier of the platform did not
properly engage to prevent the wheelchair from falling over the edge.

### B.  The Sparta Insurance Policy

Sparta issued Allied an insurance policy containing Commercial General Liability coverage
("CGL") and Commercial Auto (Business or Truckers) Liability coverage ("BAL").  ECF No. 37-3.
In this case, Sparta seeks a declaration that coverage for the accident is available only under the BAL
and not under the CGL.  ECF No. 36 at 3.  Specifically, Sparta avers that the "Aircraft, Auto or
Watercraft" exclusion in the CGL precludes coverage.  ECF No. 41 at 2.  Defendants, on the other
hand, maintain that Sparta is responsible for coverage under both the BAL and the CGL.  ECF No.
36 at 3.

"Coverage A" of the CGL provides insurance coverage for bodily injury and property
damage, stating that Sparta "will pay those sums that the insured becomes legally obligated to pay
as damages because of 'bodily injury' or 'property damage' to which this insurance applies. . . .
However, [Sparta] will have no duty to defend the insured against any 'suit' seeking damages for
'bodily injury' or 'property damage' to which this insurance does not apply."  ECF No. 37-3 at 15.
Included in the CGL's "Coverage A" are various "Exclusions," to which "[the] insurance does not
apply."  *Id.* at 16.

One such exclusion bars coverage for injury arising out of the use of certain vehicles and
states, in pertinent part,

-3-

      **g.**    **Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured.  Use includes operation and "loading or unloading."

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

*Id.* at 18 ("Auto Exclusion").

After receiving notice of Colareta's claims against Allied, Sparta tendered $500,000, which it believed to be the applicable policy limit (the one-accident limit under the BAL).  ECF No. 1 at ¶ 20.  Colareta, however, refused the tender, contending that the $1,000,000 limit provided under the CGL is applicable, or in the alternative, that both the CGL and the BAL apply for a combined limitation of $1,500,000.  *Id.* at ¶ 21; ECF No. 36 at 1; ECF No. 41 at 2.  Thus, the  issue before the Court is whether Allied is entitled to coverage under the CGL.  *See* ECF No. 41 at 2.

### III.  *Summary Judgment Standard*

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts suggesting that a reasonable jury could find in his favor. *Shiver*, 549 F.3d at 1343. But even where an opposing party neglects to submit any alleged material facts in controversy, the court must still satisfy itself that all the evidence on the record supports the uncontroverted material facts that the movant has proposed before granting summary judgment. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008);

*United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

In conducting this analysis, the Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in his favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). But the Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

### *IV.  Analysis*

### A.  Applicable Law on Insurance Policy Interpretation

Since the parties premise jurisdiction in this case on diversity grounds, this Court must determine the law applicable to this matter by looking to Florida's choice-of-law rules. *Adolfo House Distrib. Corp. v. Travelers Prop. & Cas. Ins. Co.*, 165 F. Supp. 2d 1332, 1335 (S.D. Fla. 2001) (citing *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir. 1997)); *Bituminous Cas. Corp. v. Advanced Adhesive Tech., Inc.*, 73 F.3d 335, 337 (11th Cir. 1996)). As Florida law pertains to choice of law in the context of contract interpretation, the Florida Supreme Court has "long adhered" to the rule of *lex loci contractus*. *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006). That rule provides that the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties. *Id.* (citing *Sturiano v. Brooks*, 523 So. 2d 1126, 1129 (Fla. 1988)). In a case involving an insurance policy, the place where the contract was executed is "generally considered to be the place where the policy is delivered." *Adolfo House*, 165 F. Supp. 2d at 1335 (citing *Sturiano v. Brooks*, 523 So. 2d 1126 and *Bloch v. Berkshire Ins. Co.*, 585 So. 2d 1137 (Fla. 3d DCA 1991)).

-6-

Here, the policies in controversy were issued to Florida policyholders, and the accident that gave rise to this dispute occurred in Florida. Further, the policy was issued and delivered in Florida, and the policy contains Florida-specific requirements. *See* ECF No. 37-3 at 4, 106-120. Moreover, all parties suggest that Florida law governs interpretation of the policy. *See, e.g.,* ECF No. 36 at 1 ("Pursuant to the plain language of . . . Florida law governing the interpretation of insurance policies . . . ."); ECF No. 41 at 6 (citing Florida law). Thus, this Court looks to Florida law to interpret the policy at issue. In Florida, "[w]here the duty of an insurer rests upon the legal effect of the provisions of an insurance policy, the interpretation of the policy is a matter of law for the Court to determine, and is therefore amenable to summary judgment." *Great Am. Fid. Ins. Co. v. JWR Constr. Servs., Inc.*, 882 F. Supp. 2d 1340, 1350 (S.D. Fla. 2012).

Under Florida law, courts must construe insurance contracts according to their plain meaning. *Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 291-92 (Fla. 2007) (quoting *Taurus Holdings, Inc. v. U.S. Fid. and Guar. Co.*, 913 So. 2d 528 (Fla. 2005)) (internal quotation marks omitted). The plain and unambiguous meanings are interpreted as they would be understood by the "man-on-the-street." *Harrington v. Citizen Prop. Ins. Corp.*, 54 So. 3d 999, 1001-02 (Fla. 4th DCA 2010) (quoting *State Farm Fire and Cas. Co. v. Castillo*, 829 So. 2d 242, 245 (Fla. 3d DCA 2002))(internal quotation marks omitted). "[A]mbiguities[,] [on the other hand,] are interpreted liberally in favor of the insured and strictly against the insurer who prepared the policy." *Westmoreland v. Lumbermens Mut. Cas. Co.*, 704 So. 2d 176, 179 (Fla. 4th DCA 1997) (citing *Prudential Prop. & Cas. Ins. Co. v. Swindal*, 622 So. 2d 467 (Fla. 1993)). But,"[i]f the language employed in the policy is clear and unambiguous, there is no occasion for construction or the exercise of a choice of interpretations. In the absence of ambiguity . . . it is the function of the court to give effect to and enforce the contract

-7-

as it is written." *Id.* (quoting *U.S. Fire Ins. Co. v. Morejon*, 228 So. 2d 223, 225 (Fla. 3d DCA 1976)).

Whether a provision is ambiguous is determined by the language of the policy and not the subjective intent of the parties. *See Harrington*, 54 So. 3d at 1001-02. An ambiguity arises when more than one interpretation can fairly be given to a policy provision. *State Farm Fire & Cas. Co., v. Metro. Dade Cnty.*, 639 So. 2d 63, 65 (Fla. 3d DCA 1994). But a provision is not ambiguous simply because it requires analysis or because it is complex. *Garcia*, 969 So. 2d at 291 (citing *Swire Pac Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003)). As the *Garcia* Court explained,

> When interpreting insurance contracts, we may consult references commonly relied upon to supply the accepted meanings of words. *See Gov't Employees Ins. Co. v. Novak,* 453 So. 2d 1116, 1118 (Fla.1984) (citing *Webster's Third New International Dictionary* 11 (1966) to define "accident"); *Beans v. Chohonis,* 740 So. 2d 65, 67 (Fla. 3d DCA 1999) ("One looks to the dictionary for the plain and ordinary meaning of words.").

*Garcia*, 969 So. 2d at 292. In addition, courts derive an understanding of the terms of an insurance policy by looking the policy as a whole. *Garcia*, 929 So. 2d at 291; *see also Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). Indeed, it is important for a court to "read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Anderson*, 756 So. 2d at 34 (citation omitted). With these concepts in mind, the Court now considers the particular policy language at issue.

### B. Coverage under the CGL

Defendants aver that the CGL provides coverage for Miguel Colareta's injuries because the insurance policy provides separate coverage under the "Products Completed Operations Hazard" portion of the policy, and no exclusion applies.  The Court respectfully disagrees with both contentions.

#### 1. Products-Completed Operations Hazard

Defendants posit that the CGL contains two separate types of coverage—"General" and "Products-Completed Operations Hazard" coverage.  Because products-completed operations hazard[1] is "additional" coverage, they maintain, it is not subject to the same terms and limitations

---

[1] The "Definitions" section of the CGL defines "products-completed operations hazard" as follows:

> 16. Products-completed operations hazard":
> a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
> (1) Products that are still in your physical possession; or
> (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
> (a) When all of the work called for in your contract has been completed.
> (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
> (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
> Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.
> b. Does not include "bodily injury" or "property damage"

detailed under the "basic" coverage provisions.  As evidence of this assertion, Defendants direct the

Court to the Declarations Page and Coverage Schedule of the policy.  Neither, however, convinces

the Court that the products-completed operations hazard provision constitutes coverage that is

separate and apart from that provided by the CGL.

Defendants correctly note that the Declarations Page of the policy designates a separate limit

of coverage for "Products/Completed Operations."  ECF No. 37-3 at 13.  And that is just what it

is—a different applicable *limit*, not a separate form of coverage.  For claims falling under

Products/Completed Operations, the $2,000,000 aggregate limit of liability applies.  In other words,

$2,000,000 is the maximum amount that Sparta will pay to settle those claims.  No indication exists

that the products/completed operations hazard functions as a distinct type of coverage subject to

different terms under the policy.

Defendants' contention that the Coverage Schedule provides proof of separate coverage is

similarly flawed.   In this regard, Defendants maintain that Allied paid a separate premium for the

---

arising out of:
  (1)  The transportation of property, unless the injury or
       damage arises out of a condition in or on a vehicle not
       owned or operated by you, and that condition was
       created by the "loading or unloading" of that vehicle by
       any insured;
  (2)  The existence of tools, uninstalled equipment or
        abandoned or unused materials; or
  (3)  Products or operations for which the classification,
        listed in the Declarations or in a policy, schedule, states
        that products-completed operations are subject to the
        General Aggregate Limit.

ECF No. 37-3 at 29.

products/completed operations hazard.  In particular, Defendants note that the "Automobile Repair or Service Shops" classification distinguishes between the premium paid for "Premises/Operations" and the premium paid for "Products/Completed Operations."  However, the Coverage Schedule is simply a breakdown of the overall premium paid under the CGL.  Indeed, the sum of the premiums paid for each classification in the Coverage Schedule totals the aggregate premium paid under the CGL: $3,061.   Again, this provides no evidence that claims classified as products-completed operations hazards are subject to distinct terms under the CGL.[2]

In support of their position, Defendants place heavy emphasis on the use of the term "coverage" by citing to various cases in which the word "coverage" appears next to the phrase "products-completed operations."  For example, in *Mid-Continent Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1349 (S.D. Fla. 2010), this Court made reference to "'products-completed operations hazard' *coverage*." (emphasis added).  From this, Defendants somehow extrapolate that the Court made a determination that products-completed operations hazard operates as a distinct type of coverage. The Court came to no such conclusion.  Rather, the entire discussion concerning products-

_____

[2] Defendants also point to the contract between Allied and Broward County as evidence that "products-completed operations" constitutes separate coverage.  Allied and Broward County entered into a contract for the provision of paratransit services, and pursuant to that agreement, Allied was required to purchase a commercial general liability policy that included coverage for "Products and/or Completed Operations."  ECF No. 36 at 7.  As a result, Defendants maintain, the CGL must contemplate two distinct types of coverage.  This reasoning is simply inaccurate.  Although Allied may have been required to obtain a policy with coverage for products-completed operations, there is absolutely no indication that such coverage creates distinct terms and limitations under the CGL.  The contract merely requires Allied's insurance policy to cover products-completed operations claims; it does not state that such claims are subject to separate coverage.  Moreover, regardless of the contract, the Court is bound by the plain language of the policy, which denotes no separate coverage for products-completed operations.  *See Riveroll v. Winterthur Int'l, Ltd.*, 787 So. 2d 891, 892 (Fla. 3d DCA 2001) ("[W]here no ambiguity exists in the policy, we will not impose a construction contrary to its plain language.").

completed operations was devoted to the applicable limit of liability under the insurance policy at issue. Thus *Mid-Continent* does not support Defendants' contention. In short, Defendants' emphasis on the word "coverage" is misplaced; the question is not whether products-completed operations hazard is "coverage," but rather, whether it is subject to different terms independent of those set forth in the CGL.

Contrary to Defendants' assertions, the products-completed operations hazard provision does not create distinct coverage separate and apart from the delineated coverage portions of the policy. The CGL lists only three coverages, which are each set forth in Section I of the policy: Coverage A (Bodily Injury and Property Damage Liability), Coverage B (Personal and Advertising Injury Liability, and Coverage C (Medical Payments). ECF No. 37-3 at 13. Each of these coverages contains its own insuring agreement and exclusions. By contrast, "products-completed operations hazard" is listed only in the "Definitions" section of the policy and is not designated as a type of coverage. As a result, any claim falling under the definition of "products-completed operations hazard" is subject to the terms and limitations of the coverage portion to which it applies. Because "products-completed operations hazard" is defined as applying to bodily injury and property damage, it necessarily falls under Coverage A of the CGL. [3]

_____

[3] Numerous courts have similarly concluded that "products-completed operations hazard" is subject to the terms of Coverage A under a commercial general liability policy. *See, e.g.*, *Ash v. Gainsco, Inc.*, 23 F. App'x 797, 798 (9th Cir. 2001) (holding that the products-completed operations coverage was necessarily included in Coverage A of the policy because the only insuring agreement for bodily injury and property damage was in Coverage A); *Bituminous Cas. Corp. v. St. Clair Lime Co.*, 69 F.3d 547 (10th Cir. 1995) ("The products-completed operations hazard coverage is part of 'Coverage A,' which is part of the insuring agreement."); *Auto-Owners Ins. Co. v. Potter*, 105 F. App'x 484, 488 (4th Cir. 2004) ("'Products-completed operations' are not coverages separate from the CGL; rather, they delineate the scope of coverage, making clear that insurance coverage continues to apply to work that has been completed."); *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 903 n.6 (3d Cir. 1997) (noting that coverage under the products-completed operations clause is not separate from coverage provided under Coverage A of the

Moreover, Section II, which lists the policy's limits of insurance, states as follows: "The Products-Completed Operations Aggregate Limit is the most we will pay *under Coverage A* for damages because of 'bodily injury' and 'property damage' *included in the 'products-completed operations hazard*.'" ECF No. 37-3 at 24 (emphasis added). The fact that the policy sets a limit on Sparta's liability under Coverage A with respect to products-completed operations hazards makes clear that the products-completed operations hazard clause falls under the terms of Coverage A and is not a free-standing form of coverage. As a result, any determination on Sparta's liability under the CGL in the underlying litigation must necessarily be predicated upon an interpretation of the coverage afforded under Coverage A as whole, not merely the products-completed operations hazard portion.

### 2.  The Auto Exclusion

The Insuring Agreement for Coverage A states that Sparta "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage to which this insurance applies . . . ." ECF No. 37-3 at 15. The agreement, however, is subject to the following pertinent exclusion:

**g. Aircraft, Auto Or Watercraft**

> "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

> This exclusion applies even if the claims against any insured

policy, and therefore the pertinent exclusion applied); *Gregory v. Tenn. Gas Pipeline Co.*, 948 F.2d 203, 208 (5th Cir. 1991) ("Coverage for products-completed operations hazards is afforded only by the bodily injury or property damage insuring agreements contained in Coverage A [of the policy].").

> allege negligence or other wrongdoing in the supervision,
> hiring, employment, training or monitoring of others by that
> insured, if the "occurrence" which caused the "bodily injury"
> or "property damage" involved the ownership, maintenance,
> use or entrustment to others of any aircraft, "auto" or
> watercraft that is owned or operated by or rented or loaned to
> any insured.

*Id.* at 18.

The question here is whether the Colareta Defendants' claims in the state-court action fall under this exclusion, which would preclude coverage under the CGL. Because the Court has already determined that the products-completed operations hazard does not provide separate coverage, the Court need not address Defendants' argument concerning the interplay between the products-completed operations hazard and the Auto Exclusion. The products-completed operations hazard is relevant only with respect to Sparta's limit of liability under the CGL. As a result, if Defendants' claims are otherwise subject to exclusion under Coverage A, it matters not whether the claims fall under the products-completed operations hazard, as coverage will have already been deemed precluded.

Plaintiffs aver that the Auto Exclusion is applicable in this case because Miguel Colareta's injuries arose from the use and maintenance of the Allied vehicle. Defendants counter that the Auto Exclusion does not bar coverage because the handicap transport van from which Miguel Colareta fell was "merely incidental" to the accident. In support of this argument, Defendants rely primarily on two Florida cases.

In *Hagen v. Aetna Casualty and Surety Co.*, the Fifth District Court of Appeal held that "if the use of the vehicle was merely incidental to the injury," an automobile exception will not bar coverage. 675 So. 2d 963, 966 (Fla. 5th DCA 1996). In *Hagen*, a man was injured while unloading

carpet from a delivery truck. *Id.* at 964. The method of unloading involved using a length of rope attached to a second vehicle to pull the roll of carpet from the delivery truck. *Id.* This operation was successfully performed three times before the fourth carpet fell on the delivery man, causing injury. *Id.* The delivery man brought suit, alleging negligent operation of the vehicle. *Id.* The owners of the vehicle that was used to unload the carpets sought indemnity from their insurer but were denied coverage based on a provision excluding injuries arising out of the use or operation of an automobile. *Id.* at 965. In a bad-faith action against the insurer, the circuit court found that coverage was indeed excluded, and this decision was affirmed by the Fifth District Court of Appeal. *Id.*

In its decision, the Fifth District delved into whether the vehicle was "merely incidental" to the injury suffered, so as to remove the claim from within the bounds of the policy's auto exclusion. *Id.* at 966-68. The insured argued that the vehicle was irrelevant to the accident because "several strong men" could have pulled the carpet from the truck. *Id.* at 966. The court rejected this argument, noting that even though the policy would have provided coverage had the injury resulted from several strong men unloading the carpet, it did not change the fact that since the vehicle was "*actually* used in the unloading process in such a way as to cause injury, coverage did not apply." *Id.*

The *Hagen* court also discussed two cases from other states to aid its discussion of when a vehicle is merely incidental to the injury suffered: *American Modern Home Insurance Co. v. Rocha*, 729 P.2d 949 (Ariz. Ct. App. 1986), and *Lawver v. Boling*, 238 N.W.2d 514 (Wis. 1976). In *Rocha*, a tripod was hoisted into an upright position by a vehicle. *Hagen*, 675 So. 2d at 966. However, the injury resulted when the tripod collapsed due to faulty construction, not because of the force applied by the vehicle. *Id.* Because the tripod would have collapsed regardless of how the force was

applied, the use of the vehicle was merely incidental to the injury.  *Id.*  Similarly, in *Lawver*, a lift chair was pulled into position by a rope tied to a vehicle.  *Id.*  Here, it was the defective rope that created the injury.  *Id.*  The rope would have snapped regardless of how the force was applied, and, therefore, the use of the vehicle was merely incidental to the injury suffered.  *Id.*  Such was not the case in *Hagen*.  In *Hagen*, the injury was not due to a faulty piece of equipment, but rather, the negligent operation of the vehicle.  *See id.*  Therefore, the *Hagen* court determined that the use of the vehicle was not merely incidental to the injury suffered.  *Id.*

In *Allstate Insurance Co. v. Safer*, 317 F. Supp. 2d 1345, (M.D. Fla. 2004), the district court similarly found that the insured's commercial general liability policy excluded coverage in an underlying state-court lawsuit.  The state-court action arose from a fatality caused by a collision between a car and a tractor-trailer. 317 F. Supp. 2d at 1348.  The driver of the car sued in state court, alleging that a box truck located on the defendant's property was parked in such a manner as to obscure motorists' view of the intersection where the collision occurred and consequently caused the accident.  *Id.*  The defendant's insurance policy contained an exclusion precluding coverage for bodily injury arising out of the ownership, maintenance, and use of an automobile.  *Id.*  Citing *Hagen*, the district court concluded that the box truck was not "merely incidental" to the injury alleged because although other things could have caused the same obstruction, it was the box truck that obstructed the intersection and allegedly caused the accident and injuries.  *Id.* at 1352-53.  Thus, the exclusion applied.

Here, Defendants assert that the Allied van was incidental to Miguel Colareta's injuries because the driver's purported negligence in failing to instruct Colareta to stop once he was safely in the lift was independent of the use of the vehicle.  But this is not what the Colareta Defendants

assert in the underlying state action.  In addition to the driver's negligence, the Colareta Defendants' state-court complaint also alleges that Allied was negligent for failing to maintain the vehicle, including the platform lift and platform barrier, failing to provide safe egress, and failing to warn the plaintiffs of the defective nature of the wheelchair lift and protective barrier.  *See* ECF No. 37-1. This kind of negligence, by its nature, arises out of the use and maintenance of the van and is thus subject to the exclusion provision.

The phrase "arising out of," in turn, as used in insurance policies, is unambiguous.  *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 539 (Fla. 2005).  In reviewing exclusionary provisions containing the phrase "arising out of," Florida courts have concluded that the phrase requires only "some level of causation greater than coincidence."  *Martinez v. Citizens Prop. Ins. Corp.*, 982 So. 57, 58 (Fla. 3d DCA 2008) (quoting *Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 293 (Fla. 2007)) (internal quotation marks omitted).  In this regard, the words "are of much broader significance than 'caused by'" and are "ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of,' or 'flowing from,' or in short, 'incident to or having connection with' the use of the car." *Id.* (quoting *Ohio Cas. Ins. Co. v. Cont'l Cas. Co.*, 279 F. Supp. 2d 1281, 1284 (S.D. Fla. 2003)) (internal quotation marks omitted).

In view of this definition and the Colareta Defendants' claims in the state-court action, the Court must disagree with Defendants' contention that an insufficient nexus exists between the van and the accident in question.  Although the vehicle was not being driven at the time of Miguel Colareta's fall, the exclusionary provision does not contemplate solely driving, nor have courts interpreted the policy language in such a manner.  The only pertinent question is whether the van is alleged to have contributed in any manner to Colareta's injuries.  In this case, the answer is a

-17-

resounding yes.

According to the Colareta Defendants, the accident was caused by a defect in the wheelchair lift's outer barrier, which prevented the lift's latch mechanism from latching properly.  *See* ECF No. 36 at 2. The bulk of the Colareta Defendants' state-court complaint alleges that Allied failed to adequately perform required maintenance on the vehicle and that it failed to make repairs to the vehicle after receiving notice of a recall of the latch in question.  *Id.* at 3.  While Defendants also claim that the van's driver was negligent in failing to ensure that Colareta was safely on the lift, the fact remains that, according to the Colareta Defendants' own complaint, Colareta would not have fallen had he not been using the vehicle's wheelchair lift or had the latch on the outer barrier properly engaged.  This clearly relates to the use and maintenance of the vehicle.

The complaint also alleges that Allied failed to provide adequate training to drivers on the proper procedure for loading and unloading passengers.  This, too, is contemplated by the exclusion, which, by its terms, applies even if the claims allege negligence in the training of others by the insured, if the "occurrence" that caused the "bodily injury" arose from the ownership, maintenance, or use of the automobile.  In brief, a plain reading of the policy leads to no other conclusion but that the accident was connected with the use and maintenance of the vehicle, and the Auto Exclusion therefore applies.[4]

---

[4]  Defendants also argue that coverage is afforded under the CGL because the Auto Exclusion's reference to "loading and unloading" applies only to property.  While Defendants are correct that the definition of "loading and unloading" is limited solely to the loading and unloading of property, this fact does not render the exclusion inapplicable here.  Nor does Plaintiff argue that the loading and unloading provision precludes coverage in this case.  Although the policy contains no exclusion for the loading and unloading of *persons*, the exclusion nonetheless applies to claims arising out of the ownership, use, or maintenance of a vehicle owned or operated by the insured.  This provision is unambiguous, and the nature of the Colareta Defendants' claims plainly fall within its purview.

### 3.  Concurrent-Cause Doctrine

Finally, Defendants contend the CGL  applies with respect to the underlying incident pursuant to the "concurrent cause" doctrine.  ECF No. 36 at 28-29.  Florida's concurrent-cause doctrine permits coverage under an insurance policy "when the loss can be attributed to multiple causes, as long as one of the causes is an insured risk."  *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1330 (11th Cir. 2005) (quoting *Am. Sur. & Cas. Co. v. Lake Jackson Pizza, Inc.*, 788 So. 2d 1096, 1100 (Fla. 1st DCA 2001)) (internal quotation marks omitted).  This doctrine, however, applies only "when the multiple causes of injury are not related and dependent, and involve a separate and distinct risk." *Id.* (quoting *Transamerica Ins. Co. v. Snell*, 627 So. 2d 1275, 1276 (Fla. 1st DCA 1993)) (internal quotation marks omitted).

Defendants claim that multiple, distinct acts of negligence contributed to Miguel Colareta's injuries, and each act constituted an independent cause of injury.  But the various allegations of negligence asserted in the underlying complaint are, in fact, quite interdependent upon one another.  The alleged failure to warn Colareta to stop caused him to contact the outer barrier of the lift, which failed due to an alleged defect in the latch mechanism.  Neither negligent act, alone, would have precipitated Colareta's fall.  Therefore, the purported causes of injury are mutually dependent.  *See Guideone Elite Ins. Co.*, 420 F.3d at 1330 ("Causes are dependent when one peril instigates or sets in motion the other." (citation and internal quotation marks omitted)).

Moreover, in order for the concurrent-cause doctrine to apply, an insured risk must exist.  Here, even if the alleged causes of injury were unrelated, they all nonetheless pertain to actions arising out of the use of a vehicle, that is, actions subject to the Auto Exclusion.  As a result, the doctrine is inapposite to the present action

-19-

### *V. Conclusion*

In sum, the CGL does not afford coverage to Defendants with respect to the underlying state-court litigation, as the Auto Exclusion provision of the CGL explicitly applies to the Colaretas' claims against Allied.  Accordingly, Defendants' Motion for Summary Judgment [ECF No. 36] is **DENIED,** and Plaintiff's Cross-Motion for Summary Judgment [ECF No. 41] is **GRANTED**.  All pending motions are **DENIED AS MOOT**.  Pursuant to Rule 58(a), Fed. R. Civ. P., the Court will enter Final Judgment by separate order.

**DONE and ORDERED** at Fort Lauderdale, Florida, this 6th day of January 2014.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

Copies to:
The Honorable Patrick M. Hunt
Counsel of Record

-20-